UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | X | |
| SUZANNE YARROW, | : | |
| | : | |
| Plaintiff, | : | 16-CV-7952 |
| v. | : | |
| | : | __COMPLAINT__ |
| | : | |
| MEDIVATORS INC., THOMAS LUTHY and | : | __REQUEST FOR JURY TRIAL__ |
| CANTEL MEDICAL CORP. | : | |
| | X | |
| Defendants. | | |

Plaintiff, Suzanne Yarrow (hereinafter "Plaintiff" or "Yarrow") by her attorneys, Deutsch Atkins, P.C., hereby alleges Defendants Medivators Inc. (hereinafter "Medivators"), Thomas Luthy (hereinafter "Luthy"), and Cantel Medical Corp (hereinafter "Cantel") (hereinafter jointly referred to as "Defendants") engaged in unlawful employment discrimination and retaliation as follows:

## PARTIES

1. Yarrow is female and an individual residing in Rye, New York.

2. Medivators has a principal place of business in Minneapolis, Minnesota and is Plaintiff's employer as that term is defined in Title VII; the Americans with Disabilities Act of 1990, as amended, 42 U.S.C § 12101 et seq. (hereinafter "ADA"); New York State Human Rights Law, New York Executive Law § 296(a) (hereinafter "NYSHRL"); New York City Human Rights Law, New York City Administrative Code §8-107(1) (hereinafter "NYCHRL"), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. (hereinafter "NJLAD").

3. Medivators employs more than 500 individuals.

4. Luthy is an individual who resides in Norwalk, Connecticut, and from December 2014 forward, was Ms. Yarrow's direct supervisor.

1

5.    Luthy is an individual who resides in Norwalk, Connecticut, and from December 2014 forward, was Ms. Yarrow's direct supervisor.

## JURISDICTION AND VENUE

6.    Jurisdiction and venue are proper pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b)&(c).

7.    This Court has supplemental jurisdiction over Plaintiff's NYSHRL, NYCHRL, and NJLAD claims pursuant to 28 U.S.C. § 1367.

8.    Venue is proper in the Southern District of New York because the violations of the Plaintiff's federal and state civil rights occurred in connection with her servicing territories in New York City.

## PROCEDURAL HISTORY

9.    Plaintiff filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on December 8, 2015, Charge No. 524-2016-00235 (the "EEOC Charge"), alleging that defendants, as aided and abetted by Luthy, discriminated against Plaintiff based on her sex (gender) in violation of Title VII of the Civil Rights Act of 1964 and retaliated against her for opposing discrimination.

10.    Plaintiff timely filed an Amended Charge of discrimination with the EEOC on or about June 9, 2016 alleging, in addition to sex (gender) discrimination and retaliation, in violation of Title VII, that Medivators, as aided and abetted by Luthy, discriminated against her in violation of the Americans with Disabilities Act by denying her a reasonable accommodation and constructively discharging Plaintiff.

11.    The EEOC issued a Notice of Right to Sue on July 15, 2016.  A true and accurate copy of the right to sue letter is attached hereto as **Exhibit A**.

## STATEMENT OF FACTS

### Background

12.   From December 2009 until Ms. Yarrow was constructively discharged in April 2016, Ms. Yarrow worked for Medivators.

13.   At all times relevant herein, Ms. Yarrow performed her work out of her home in Rye, New York.

14.   Medivators sells and services, among other things, (i) machines and chemicals used to disinfect endoscope equipment and (ii) equipment that allows hospitals and health care facilities to track endoscopes.

15.   Medivators initially hired Ms. Yarrow as a Clinical Education Specialist.

16.   In the Clinical Education Specialist role, Ms. Yarrow was responsible for setting-up and programming the endoscope disinfection machines that Medivators sold to clients throughout the North East and Mid-Atlantic regions of the United States.

17.   Ms. Yarrow also taught health care providers that purchased the Medivators endoscope disinfection machines how to use such equipment.

18.   Depending on the type of machine and the number of staff that needed to be trained, Ms. Yarrow would spend from one day to four days at a client site setting-up, programming and teaching a client's staff how to use the Medivators endoscope disinfection equipment.

19.   During the time Ms. Yarrow was a Clinical Education Specialist, Mr. Kim Smith supervised her.

20.   Mr. Smith consistently gave Ms. Yarrow positive performance evaluations and commended her for her work.

### Medivators Promotes Ms. Yarrow to Reprocessing Sales Consultant/Capital Specialist

21.   In early 2012, Medivators terminated the Reprocessing Sales Consultant/Capital

Specialist ("Capital Specialist") who was responsible for the New York City area (which included all boroughs, except the Bronx, and Nassau and Suffolk Counties, New York).

22.   That individual had purportedly damaged relationships with existing clients.

23.   At that time. Ms. Yarrow informed Mr. Smith that she would do whatever needed to be done to assist in the sales in the New York City area.

24.   The New York City area was one of the more difficult sales areas for Medivators.

25.   This was because hospitals and health care facilities in New York City were more limited in how much space they had to place hospital equipment as compared to other sales areas.

26.   The endoscope disinfecting equipment that Medivators sells has to be connected to plumbing for hot water intake.

27.   Many of the hospitals in New York City have older plumbing and electrical equipment, which created challenges in installing Medivators equipment.

28.   These challenges included maintaining proper water pressure, maintaining proper water temperature and sediment in the water.

29.   Many buildings in the New York City region have outdated and/or insufficient plumbing which affects the operation of the endoscope disinfecting equipment because the equipment is sensitive to water sediment, water pressure and temperature.

30.   From in or about April 2012 to the beginning of July 2012, Ms. Yarrow continued to fill her role as a Clinical Education Specialist, but also acted as the Capital Specialist for the New York City region.

31.   In recognition of her successful work, Medivators formally promoted Ms. Yarrow in July 2012 to the position of Capital Specialist.

### Ms. Yarrow's Job Duties as a Capital Specialist

32.   As a Capital Specialist, Ms. Yarrow's primary duty was to sell the endoscope disinfecting

machines, often referred to as Automatic Endoscope Reprocessors ("AERs").

33.   AERs come in two forms: single shot and multi-use.

34.   Single-shot AERs use disinfecting chemicals only once when disinfecting endoscope equipment and dispose of the chemicals after a single disinfecting cycle.

35.   The multi-use AERs – as the name implies – would allow the user to use disinfecting chemicals for more than one cycle.

36.   Medivators preferred that its Capital Specialist sell the single shot AERs because this meant that clients would have to purchase more disinfecting chemicals from Medivators at a greater cost.

37.   The AERs came in three sizes and ranged in price from approximately twenty-six thousand dollars ($26,000) to approximately fifty-five thousand dollars ($55,000).

38.   AERs have a life-cycle of seven (7) years to nine (9) years depending on how well the client cares for the equipment, how often the client uses the equipment and whether the client performs the recommended annual service.

39.   Because of the price of the AERs and their long life-cycle, the sale of AERs involved a process that stretched out over an average of 12 to 18 months.

40.   This process involved building trust and relationships with the clients.

41.   The decision to purchase an AER was often made by a committee.

42.   Ms. Yarrow was also responsible for selling the Medivators ENDORA system, which Medivators launched in or about October 2013.

43.   A hospital or health care facility would use the ENDORA system to track the cleaning of the endoscopes (which could cost up to $50,000 each) as well as their physical location.

44.   The cost of the ENDORA system depended on the size of the system and could range in

5

price from low five figures to six figures.

45.   For example, Ms. Yarrow sold two ENDORA systems in FY 2015, one for fifty thousand dollars ($50,000) and one for one hundred and sixty thousand dollars ($160,000).   Ms. Yarrow was the only Capital Sales Specialist in FY 2015 to meet the FY 2015 sales goal of selling two ENDORA systems.

46.   By all measurable accounts, Ms. Yarrow excelled in her position.

47.   In or about June 2014, Mr. Smith resigned from Medivators.

48.   Medivators promoted Mr. Eric Sandvich to Mr. Smith's position, and Ms. Yarrow reported to Mr. Sandvich from approximately August 2014 until Mr. Sandvich resigned in November 2014.

49.   Though Mr. Sandvich never had the opportunity to formally review Ms. Yarrow's performance, he consistently praised her work as a Capital Specialist.

### Mr. Luthy Becomes Ms. Yarrow's Supervisor and Commences a Campaign of Discriminatory Conduct

50.   In December 2014, Medivators hired Mr. Luthy, who became Ms. Yarrow's manager.

51.   Previously and in or about August 2014, the East region was among one of the last regions to transition to the "PODS" sales approach.

52.   Under this approach, sales personnel work in PODs (small groups) generally consisting of one Capital Specialist, one or more Account Managers (who sold consumable procedural products used in medical procedures) and a Clinical Education Specialist.

53.   Mr. Luthy had no prior background in selling capital endoscope disinfecting equipment.

54.   Rather, Mr. Luthy's background was in selling lower-priced equipment and supplies used in the endoscopy procedure that required a shorter selling cycle.

55.   Immediately after Mr. Luthy became Ms. Yarrow's supervisor, he targeted her as the only

women Capital Specialist that reported to him.

56.    Mr. Luthy continually subjected Ms. Yarrow to a hostile work environment based on her sex.

57.    For example, on January 26, 2015, during a meeting at a Starbucks in Darien, CT, Mr. Luthy told Ms. Yarrow that she was "an overly emotional woman" and that she should not "show any emotion . . . even if your son is dying . . . Do you understand."

58.    Mr. Luthy further stated that she was "an older woman" and falsely claimed that Ms. Yarrow's position as a Capital Specialist was "[her] first sales job."

59.    In fact, Ms. Yarrow – who is also a registered nurse – has over 20 years' experience selling medical equipment and services.

60.    Throughout the spring and summer of 2015, Mr. Luthy continued to engage in severe and pervasive conduct that a reasonable person would find hostile and/or abusive.

61.    For example, on March 10, 2015, at a territory meeting at the Marriott in Stamford, Connecticut, Mr. Luthy used the term "cunt."

62.    A little over two months later, on or about May 13, 2015, Mr. Luthy evaluated Ms. Yarrow's presentation at North Shore-LIJ Hospital by stating that her style was that of an "appeasing woman" and that she "need[ed] to grow a pair of balls."

63.    Mr. Luthy told Ms. Yarrow, "You do not know what the fuck you are doing," even though Ms. Yarrow was one of the most successful Capital Specialists that he supervised and she serviced one of the most difficult regions.

64.    On another phone call involving the installation of machines at Memorial Sloan Kettering Hospital, Mr. Luthy stated to Ms. Yarrow, "This is fucking on you," and threatened Ms. Yarrow that her "job [wa]s on the line" due to shipping problems that had occurred (which were not Ms.

Yarrow's fault and which Ms. Yarrow was actively attempting to correct).

65.     Although it has never been the biggest producing territory, Medivators had set Ms. Yarrow's sales goal for Fiscal Year 2015 as the highest capital sales goal in the entire region.

### Ms. Yarrow Excels in Her Position Despite Mr. Luthy's Conduct

66.     Despite Mr. Luthy subjecting Ms. Yarrow to discriminatory conduct that caused her emotional distress, Ms. Yarrow's sales performance continued to be excellent.

67.     As of June 30, 2015, Ms. Yarrow ranked fourth out of twenty-six representatives for the Capital Specialist Don Byrne Founders Award (the "Founders Award") – the most prestigious sales award for a Capital Specialist at Medivators.

68.     The Founder award is considered the best indicator of a sales consultant's performance.

69.     As stated in the fiscal year 2015 sales award description booklet, "this coveted award is Medivators most prestigious individual Sales Award. This award recognizes the #1 Account Manager and #1 Capital Specialist who achieved the most outstanding performance over the past two fiscal years (August 1, 2013 - July 31, 2015)."

70.     The criteria for rank is based on "the Capital Specialist with the largest increase sales of "Focus" products which include Single Shot AERs, Endora and Veriscan over the past two fiscal years."

71.     In contrast, her male regional teammates ranked ninth (Mr. Al Iuele); thirteenth (Mr. Makovec) and twentieth (Mr. Moreau).

72.     Despite Ms. Yarrow's bloated sales goals, Ms. Yarrow achieved 94% of her combined sales goal made up of "focus and core product" sales goals.

73.     In contrast, Mr. Merrick Slater who was Ms. Yarrow's POD partner and sold Medivators' disposable products used in endoscopy procedures (known as "Procedural

Products") – had the second lowest combined (focus and core products) sales goal for such Procedural Products in Mr. Luthy's region for fiscal year 2015.

74.   Mr. Slater's territory included all five boroughs in New York City while Ms. Yarrow's included only 4 boroughs.

75.   The sales goals for Procedural Products should generally be in line with the sales goals for the capital endoscope equipment within the same sales area.

76.   For example, if Medivators sets a higher goal for Capital equipment in a sales region, then it should set a corresponding higher goal for Procedural Products.

77.   This is because, the more procedures a client performs, the more capital equipment it will need to purchase, and the more Procedural Products it will need to purchase.

78.   It should be noted that Mr. Luthy and Medivators reduced Ms. Yarrow's fiscal year 2016 "core" products sales goal from $415,000.00 in fiscal year 2015 to $193,000.00, which brings her combined sales goal more in-line with Mr. Slater's combined sales goals.

79.   In addition, as of June of fiscal year 2015, Ms. Yarrow had sales growth of $805,000.00 over the previous year for "focused" products and had generated the most focused product revenue of all Capital Specialists, exceeding her "focused" product sales goal of $745,000.00 by $70,000, which equaled 108% of goal.

80.   For exceeding her "focused" product goal, Ms. Yarrow received a 2015 Quota Achiever's Club award.

81.   Furthermore, in fiscal year 2015, Ms. Yarrow ranked first in ENDORA sales, exceeding the individual who placed second by over $100,000, for which Medivators recognized Ms. Yarrow with the 2015 Top ENDORA Sales Award.

82.   Ms. Yarrow was the only sales representative in the company to meet the sales goal of

selling two ENDORA systems for fiscal year 2015.

**Mr. Luthy Further Efforts to End Ms. Yarrow's Employment with
Medivators and Retaliation Against Ms. Yarrow for Her Complaining
About Mr. Luthy's Use of Demeaning and Condescending Language**

83.   On or about August 4, 2015, Ms. Yarrow submitted her 360 review of Mr. Luthy in which she objected to his use of "condescending, demeaning and blaming language" towards her.

84.   For fear of retaliation for making these complaints of gender discrimination, Ms. Yarrow further wrote that she "hope[d] that [her] comments will be kept confidential and that there will be no adverse repercussions for [her] honesty."

85.   Mr. Luthy retaliated against Ms. Yarrow by ramping-up his campaign to artificially create a reason to terminate her employment.

86.   On or about August 11, 2015, Mr. Luthy contacted Ms. Yarrow by telephone and told her that she "needed to step it up this year."

87.   After Ms. Yarrow asked him what he meant, Mr. Luthy responded there are "new capital sales reps that are kicking ass and exceeding sales goals."

88.   Ms. Yarrow questioned whether the capital sales reps to which Mr. Luthy was referring were "new" at Medivators.

89.   Mr. Luthy responded, "No, they are in other shops, but they're kicking ass."

90.   Shortly thereafter, on September 24, 2015, Mr. Luthy and Medivators placed Ms. Yarrow on a Performance Improvement Plan ("PIP").

91.   Mr. Luthy had no real basis to place Ms. Yarrow on a PIP, so he either made false claims against her or unfairly criticized her performance based on wholly subjective criteria.

92.   Mr. Luthy did so because he wanted to oust her as the only woman Capital Specialist and he knew that if he relied on any real measurable performance indicators, he had no basis to place

Ms. Yarrow on a PIP.

93.   As Ms. Yarrow can demonstrate with emails and commission reports, her PIP contained many factual inaccuracies.

94.   First, many of the monthly sales numbers on the PIP for fiscal year 2015 are incorrect.

95.   In addition, Mr. Luthy wrote that Ms. Yarrow did not meet her sales quota for fiscal year 2014.

96.   In fact, Ms. Yarrow did not have a written quota for that year.

97.   Mr. Luthy has peppered Ms. Yarrow's PIP with vaguely-worded and unsupported criticisms.

98.   For example, Mr. Luthy wrote that he had "receive[d] feedback around [Ms. Yarrow's] inability to 'play nice' in the POD and clinical relationship."

99.   However, he provided no further explanation for these comments and also failed to include Ms. Yarrow's 360 reviews from her colleagues (which would have revealed whether such purported feedback had existed).

100.  Ms. Yarrow's PIP is permeated with other clearly false statements.

101.  For example, Mr. Luthy stated that Ms. Yarrow "has not embraced the POD structure" although it is "2 years into the strategy."

102.  These statements are inaccurate.

103.  Mr. Luthy's East Region entered into the POD structure as of August 1, 2014, not two years earlier (August 2013) as Mr. Luthy claimed.

104.  Furthermore, Ms. Yarrow can demonstrate numerous instances in which she engaged her POD partner when an appropriate situation arose for a "product portfolio" or "rent to own" selling situation.

105. In fact, Ms. Yarrow had worked diligently with her POD partner on five such deals which will be worth hundreds of thousands of dollars annually.

106. Mr. Luthy designed the PIP so that Ms. Yarrow would almost certainly fail.

107. Mr. Luthy omitted Ms. Yarrow's sales numbers for October 2014 and began his analysis and revenue requirement portion of the PIP in November 2014.

108. Curiously, Ms. Yarrow had some of her best sales performance numbers in October 2014.

109. In addition, several of the sales numbers that Mr. Luthy used in performing his "analysis" were lower than those set forth in Ms. Yarrow's commission reports.

110. Further, Mr. Luthy required in the PIP – under threat of termination – that Ms. Yarrow achieve a monthly sales quota of at least seventy-three thousand dollars ($73,000) which was unattainable and unreasonable – which Mr. Luthy knew.

111. The sales of the type of medical equipment that Ms. Yarrow sold for Medivators – which are "big ticket items" for which hospitals must plan, budget and undertake construction prior to sales and shipping – can take many months to complete.

112. These sales do not occur on a week-to-week or month-to-month basis like the Procedural Products.

113. As further evidence that the PIP was an artifice to terminate Ms. Yarrow's performance, Mr. Luthy did not place any of Ms. Yarrow's male colleagues on a PIP at the time.

114. This was despite the fact that Mr. Al Iuele ranked twentieth out of twenty-sixth in sales, achieved only sixty five percent (65%) of his overall goal and did not meet his "focused" product sales goal, his "core" product sales goal, or his "2 ENDORA System" sales goal.

115. He ranked below Ms. Yarrow in almost every sales category for fiscal year 2015.

116. Furthermore, Mr. Luthy was in no position to evaluate Ms. Yarrow's work as he had only

spent the equivalent of a day and a half in the field working with her from the start of his employment with Medivators in December of 2014 until Mr. Luthy placed Ms. Yarrow on the PIP.

117. Indeed, Mr. Luthy and Medivators waited until after Ms. Yarrow filed her Charge of Discrimination with the EEOC in December 2015 – in which Ms. Yarrow pointed to these facts as evidence of discrimination – to place Mr. Iuele on a PIP (which was in January 2016).

118. However, as of January 2016, Mr. Iuele was meeting his sales goals and there seemed to 'be no apparent reason to place him on a PIP other than to cover-up Defendants' discriminatory conduct.

### Because of the Unwarranted Stress that Mr. Luthy and Medivators Placed on Ms. Yarrow, She was Forced to Take a Leave of Absence for Medical Reasons in 2015

119. Mr. Luthy's conduct and placing Ms. Yarrow on a PIP took its toll on Ms. Yarrow.

120. Ms. Yarrow took a leave of absence in or about September 25, 2014 to cope with the stress that Mr. Luthy placed upon her and which stress resulted in her becoming disabled.

121. It was clear at that point that Mr. Luthy would do anything to terminate Ms. Yarrow's employment with Medivators or force her to resign.

122. In fact, Ms. Yarrow would later learn that Mr. Luthy had already identified her replacement prior to putting her on the PIP.

123. That individual, who lived in the New York City region, accepted a job offer from Medivators, but ultimately declined the offer in favor of a position with a different employer whom he began working for in October 2015.

124. This left Mr. Luthy in an undesirable position for which he was reprimanded for not having a "back up".

**Medivators Engages in Further Discriminatory and Retaliatory Conduct, Which Includes
Rejecting Ms. Yarrow's Request for a Reasonable Accommodation
and Refusing to Engage in any Interactive Process to Accommodate Her Disability**

125. Beginning in December 2015 and continuing through April 2016, Ms. Yarrow notified Medivators that when she returned to work that it was imperative that she report to a different supervisor – something Medivators had done for another employee in the past beyond the context of a reorganization.

126. This request was based on the fact that Mr. Luthy was the reason Ms. Yarrow had to take a leave of absence.

127. On February 3, 2016, Medivators informed Ms. Yarrow that they had no suitable position for her.

128. Ms. Yarrow understood this to mean Medivators was terminating her employment.

129. On February 8, 2016, Mr Luthy announced to the East Region that he had filled Ms. Yarrow's NYC territory with a new hire, who also lived in the NYC region and would be serving as a "floater" which was a position that had not previously existed.

130. On March 8, 2016, Medivators informed Ms. Yarrow that she could return to her position as a Capital Sales Specialist, still reporting to Mr. Luthy.

131. As an alternative, Medivators offered to demote Ms. Yarrow to a Clinical Education Specialist, under a different manager.

132. Ms. Yarrow asked Medivators in a letter of March 27, 2016, that if it was Medivators' position that it would be an undue burden to reassign her to a different supervisor, to please respond with an explanation.

133. Medivators never sufficiently responded to this request.

134. Instead, in a letter of April 6, 2016, Ms. Karen Davis, Medivators' Director of Human Resources, claimed that she had investigated the allegations in the Charge of Discrimination and

found them to be without merit.

135. At no time during this alleged investigation did Medivators speak to Ms. Yarrow about the specifics of her Charge of Discrimination.

136. In the April 6, 2016 letter, Medivators offered – as a purported accommodation of Ms. Yarrow's disability – that its Human Resources department would be involved in any of the performance reviews of her by Mr. Luthy to supposedly ensure that "performance discussions, if any, proceed in a fair and respectful manner."

137. This would not sufficiently address Mr. Luthy's discriminatory conduct because the issue was how he mistreated Ms. Yarrow on a day-to-day basis.

138. Again, Medivators offered to demote Ms. Yarrow to a Clinical Education Specialist and stated that they would "create" a position for her despite there being no Clinical Education Specialist job at the time.

139. However, the Medivators Career website listed a Clinical Education Specialist opportunity at that time, so Medivators' was not "creating" the position for Ms. Yarrow as it pretended.

140. Medivators also stated in the April 6th letter that there "may be openings in other geographic locations for Capital Specialists" (emphasis added), but Medivators offered no specifics.

141. In a letter of April 8, 2016, Ms. Yarrow again notified Medivators that "I would like to return to my sales position with a reasonable accommodation of reporting to a different manager so as to avoid a repeat of the work environment set forth in my EEOC Charge."

142. In her April 8th letter, Ms. Yarrow explained to Medivators that (i) it was impossible for her to relocate to a new region in order to work as a Capital Specialist because of family

responsibilities and (ii) a demotion to a Clinical Education Specialist position was not a reasonable solution given the significant reduction in pay and the travel requirements of fifty (50) to seventy (70) percent of the time (which would take her away from her family obligations).

### Medivators Continues Its False Claims About Ms. Yarrow's Performance

143. In a weak attempt to claim that Ms. Yarrow's sales were poor, Medivators submitted a letter to the EEOC, dated April 7, 2016 (the "Position Statement"), in which they listed her sales over an eleven (11) month period (instead of a one-year period).

144. First, Medivators – as Mr. Luthy had done before – conveniently left out the month of October 2014 during which Ms. Yarrow had her highest sales of over $450,000.

145. Second, the sales numbers that Medivators reported in the Position Statement were ·inaccurate.

146. In the Position Statement, Medivators and Mr. Luthy fabricated stories about Ms. Yarrow's conduct from December 2014 to Sept 2015 in an attempt to portray her as unstable.

147. Many of these supposed performance deficiencies were not even mentioned in the PIP or were different from the PIP.

### Medivators Constructively Discharges Ms. Yarrow

148. By letter dated April 19, 2016, Medivators rejected Ms. Yarrow's request for a reasonable accommodation and offered no alternatives other than what they previously proposed.

149. Medivators also falsely claimed in that letter that Ms. Yarrow had stated I had "no confidence" in the leadership ability of Mr. Bob Krajeski (Mr. Luthy's supervisor).

150. This was a lie.

151. Ms. Yarrow had stated that she had no confidence that any evaluation of her would be

fair or that Mr. Krajeski would be impartial because of Mr. Krajeski's long standing business and personal relationship with Mr. Luthy over twenty (20) years.

152. In fact, it was Mr. Krajeski who had brought Mr. Luthy into Medivators.

153. In addition, Medivators has not disciplined Mr. Luthy for his unlawful conduct.

154. Medivators has rewarded Mr. Luthy by recently promoting him.

155. Ms. Yarrow ultimately recognized what Medivators was trying to do – and what it had successfully done – force Ms. Yarrow into a constructive discharge (which took effect at the end of April 2016).

156. Based on information and belief, the discriminatory conduct asserted herein emanated from Medivators parent corporation, Cantel, by and through their participation, authorization, and/or promotion of these discriminatory actions from its headquarters in Little Falls, New Jersey.

### COUNT ONE
### Sex (Gender) Discrimination in Violation of
### Title VII, the NYSHRL, the NYCHRL and the NJLAD

157. Plaintiff repeats and re-alleges Paragraphs 1 through 156 of the Complaint as if fully set forth herein.

158. By and through the actions described herein, Defendants discriminated against Plaintiff on the basis of her sex (gender) in violation of Title VII.

159. By and through the actions described herein, Defendants discriminated against Plaintiff on the basis of her sex (gender) in violation of the NYSHRL.

160. By and through the actions described herein, Defendants discriminated against Plaintiff on the basis of her sex (gender) in violation of the NYCHRL.

161. By and through the actions described herein, Defendants discriminated against Plaintiff on the basis of her sex (gender) in violation of the NJLAD.

162. By and through the actions described herein, Plaintiff was subjected to unlawful discrimination and constructively discharged Plaintiff from employment on the basis of her sex (gender) while similarly situated male employees were treated more favorably.

163. Plaintiff was constructively discharged by Defendants from her employment with Medivators on the basis of her sex (gender).

164. The actions of Defendants described herein reflect and constitute a pattern and practice of gender discrimination against Plaintiff.

165. A determinative and/or motivating factor in Plaintiff's constructive discharge was Plaintiff's sex (gender).

166. Upper management of Cantel and Medivators participated in and/or was willfully indifferent to the discriminatory conduct described herein.

167. The foregoing conduct of Defendants is willful and intentional and especially egregious.

168. As a result of the Defendants' discrimination against Plaintiff on account of her sex (gender), Plaintiff has suffered, and will continue to suffer, economic losses, including but not limited to lost salary, bonuses, and other employment benefits.

169. As a result of Defendants' discrimination against Plaintiff on account of her sex (gender), Plaintiff has suffered, and will continue to suffer severe emotional and psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career.

170. The conduct set forth herein involved Cantel's and Medivators' upper management and was egregious, willful, wanton, and in reckless disregard for Plaintiff's rights for which punitive damages are appropriate.

**WHEREFORE** Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a) Compensatory damages for loss of sages (back pay and front pay) and other lost employment benefits;

(b) Compensatory damages for emotional distress, including but not limited to psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career;

(c) Punitive damages;

(d) Medical expenses;

(e) Attorneys' fees, pre- and post-judgment interest, and costs of suit; and

(f) Such other relief as this Court may deem just and appropriate.

## COUNT TWO
### Retaliation in Violation of
### Title VII, ADA, the NYSHRL, the NYCHRL and the NJLAD

171. Plaintiff repeats and realleges Paragraphs 1 through 170 of the Complaint as if fully set forth herein.

172. Defendants retaliated against Plaintiff for making complaints that Defendants were engaging in sex (gender) and/or disability discrimination.

173. By and through the conduct described herein, Defendants retaliated against Plaintiff for making complaints of sex (gender) discrimination in violation of Title VII.

174. By and through the conduct described herein, Defendants retaliated against Plaintiff for making complaints of disability discrimination in violation of the ADA.

175. By and through the conduct described herein, Defendants retaliated against Plaintiff for making complaints of sex (gender) discrimination and/or disability discrimination in violation of the NYSHRL

176. By and through the conduct described herein, Defendants retaliated against Plaintiff for making complaints of sex (gender) discrimination in violation of the NYCHRL

177. By and through the conduct described herein, Defendants retaliated against Plaintiff for making complaints of sex (gender) discrimination in violation of the NJLAD.

178. Defendants' retaliation against Plaintiff caused Plaintiff to be constructively discharged from her employment with Medivators.

179. Defendants' upper management participated in and/or was willfully indifferent to the retaliatory conduct described herein.

180. Defendants' conduct described herein was willful and intentional and especially egregious.

181. As a result of the Defendants' retaliation against Plaintiff, Plaintiff has suffered and will continue to suffer economic losses, including but not limited to salary, bonuses, and other employment benefits.

182. As a result of the Defendants' retaliation against Plaintiff, Plaintiff has suffered and will continue to suffer severe emotional and psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career.

183. The conduct described herein involved Cantel's and Medivators' upper management and was egregious, willful, wanton, and in reckless disregard for Plaintiff's rights for which punitive damages are appropriate.

**WHEREFORE** Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

    (a) Compensatory damages for loss of sages (back pay and front pay) and other lost employment benefits;

    (b) Compensatory damages for emotional distress, including but not limited to psychological harm, stress, humiliation, mental anguish, damage to reputation and

harm to her career;

(c) Punitive damages;

(d) Medical expenses;

(e) Attorneys' fees, pre- and post-judgment interest, and costs of suit; and

(f) Such other relief as this Court may deem just and appropriate.

**COUNT THREE**
**Disability Discrimination in Violation of the**
**ADA, the NYSHRL, the NYCHRL and the NJLAD**

184. Plaintiff repeats and realleges Paragraphs 1 through 183 of the Complaint as if fully set forth herein.

185. Plaintiff had a "disability" as that term is defined in the ADA, NYSHRL, NYCHRL and NJLAD.

186. By and through the conduct described herein, Defendants discriminated against Plaintiff on the basis of her disability in violation of the ADA.

187. By and through the conduct described herein, Defendants discriminated against Plaintiff on the basis of her disability in violation of the NYSHRL.

188. By and through the conduct described herein, Defendants discriminated against Plaintiff on the basis of her disability in violation of the NYCHRL.

189. By and through the conduct described herein, Defendants discriminated against Plaintiff on the basis of her disability in violation of the NJLAD.

190. By and through the conduct described herein, Plaintiff was subjected to unlawful discrimination and constructively discharged on the basis of her disability.

191. The actions of Defendants described herein reflect and constitute a pattern and practice of disability discrimination against Plaintiff.

192. A determinative and/or motivating factor in Plaintiff's constructive discharge was Plaintiff's disability.

193. Upper management of Cantel and/or Medivators participated in and/or was willfully indifferent to the discriminatory conduct described herein.

194. The foregoing conduct of Defendants is willful and intentional and especially egregious.

195. As a result of the Defendants' discrimination against Plaintiff on account of her disability, Plaintiff has suffered, and will continue to suffer, economic losses, including but not limited to salary, bonuses, and other employment benefits.

196. As a result of Defendants' discrimination against Plaintiff on account of her disability, Plaintiff has suffered, and will continue to suffer severe emotional and psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career.

197. The conduct set forth herein involved Cantel's and Medivators' upper management and was egregious, willful, wanton, and in reckless disregard for Plaintiff's rights for which punitive damages are appropriate.

**WHEREFORE** Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a) Compensatory damages for loss of sages (back pay and front pay) and other lost employment benefits;

(b) Compensatory damages for emotional distress, including but not limited to psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career;

(c) Punitive damages;

(d) Medical expenses;

(e) Attorneys' fees, pre- and post-judgment interest, and costs of suit; and

(f) Such other relief as this Court may deem just and appropriate.

## COUNT FOUR
### Failure to Accommodate in Violation of the
### ADA, the NYSHRL, the NYCHRL and the NJLAD

198. Plaintiff repeats and realleges Paragraphs 1 through 197 of the Complaint as if fully set forth herein.

199. Plaintiff has a "disability" as that term is defined in the ADA, NYSHRL, NYCHRL and NJLAD.

200. Defendants were aware of Plaintiff's disability and refused to provide a reasonable accommodation to Plaintiff without any legitimate business justification.

201. By and through the conduct described herein, Defendants refused to provide a reasonable accommodation to Plaintiff in violation of the ADA.

202. By and through the conduct described herein, Defendants refused to provide a reasonable accommodation to Plaintiff in violation of the NYSHRL.

203. By and through the conduct described herein, Defendants refused to provide a reasonable accommodation to Plaintiff in violation of NYCHRL.

204. By and through the conduct described herein, Defendants refused to provide a reasonable accommodation to Plaintiff in violation of the NJLAD.

205. Upper management of Cantel and/or Medivators participated in and/or was willfully indifferent to the discriminatory conduct described herein.

206. The foregoing conduct of Defendants is willful and intentional and especially egregious.

207. As a result of the Defendants' failure to provide a reasonable accommodation to Plaintiff, Plaintiff has suffered, and will continue to suffer, economic losses, including but not limited to salary, bonuses, and other employment benefits.

208. As a result of the Defendants' failure to provide a reasonable accommodation to Plaintiff, Plaintiff has suffered, and will continue to suffer severe emotional and psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career.

209. The conduct set forth herein involved Cantel's and Medivators' upper management and was egregious, willful, wanton, and in reckless disregard for Plaintiff's rights for which punitive damages are appropriate.

**WHEREFORE** Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a) Compensatory damages for loss of sages (back pay and front pay) and other lost employment benefits;

(b) Compensatory damages for emotional distress, including but not limited to psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career;

(c) Punitive damages;

(d) Medical expenses;

(e) Attorneys' fees, pre- and post-judgment interest, and costs of suit; and

(f) Such other relief as this Court may deem just and appropriate.

**COUNT FIVE**
**Aiding and Abetting Discrimination**
**in Violation of the NYSHRL, the NYCHRL and the NJLAD**

210. Plaintiff repeats and realleges Paragraphs 1 through 209 of the Complaint as if fully set forth herein.

211. Including but not limited to the conduct described herein, Cantel's and Medivators' upper management including but not limited to Luthy, aided and abetted discrimination and/or retaliation in violation of the NYSHRL.

212.  Including but not limited to the conduct described herein, Cantel's and Medivators' upper management including but not limited to Luthy, aided and abetted discrimination and/or retaliation in violation of the NYCHRL.

213.  Including but not limited to the conduct described herein, Cantel's and Medivators' upper management including but not limited to Luthy, aided and abetted discrimination and/or retaliation in violation of the NJLAD.

214.  Cantel's and Medivators' upper management including but not limited to Luthy participated in such unlawful conduct that was egregious, willful, wanton, and in reckless disregard for Plaintiff's rights, such as to justify an award of punitive damages.

215.  As a result of Cantel's and Medivators' upper management including but not limited to Luthy, aiding and abetting discrimination and/or retaliation against Plaintiff, Plaintiff has suffered and will continue to suffer economic losses, including but not limited to salary, bonuses and other employment benefits.

**WHEREFORE** Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a) Compensatory damages for loss of sages (back pay and front pay) and other lost employment benefits;

(b) Compensatory damages for emotional distress, including but not limited to psychological harm, stress, humiliation, mental anguish, damage to reputation and harm to her career;

(c) Punitive damages;

(d) Medical expenses;

(e) Attorneys' fees, pre- and post-judgment interest, and costs of suit; and

(f) Such other relief as this Court may deem just and appropriate.

**DEUTSCH ATKINS, P.C.**
*Attorneys for Plaintiff, Suzanne Yarrow*
25 Main Street, Suite 104
Court Plaza North
Hackensack, New Jersey 07601
Telephone: (201) 498-0900
Facsimile: (201) 498-0909

By: _____
        BRUCE L. ATKINS

Dated: October 11, 2016


## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

**DEUTSCH ATKINS, P.C.**
*Attorneys for Plaintiff, Suzanne Yarrow*
25 Main Street, Suite 104
Court Plaza North
Hackensack, New Jersey 07601
Telephone: (201) 498-0900
Facsimile: (201) 498-0909

By: _____
        BRUCE L. ATKINS

Dated: October 11, 2016

**"Exhibit A"**

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: Suzanne Yarrow<br>505 Midland Avenue<br>Rye, NY 10580 | From: Newark Area Office<br>283-299 Market Street<br>Two Gateway Center, Suite 1703<br>Newark, NJ 07102 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 524-2016-00235 | Rayba Watson,<br>Enforcement Supervisor | (973) 645-6021 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

John Waldinger,
Area Office Director

JUL 1 5 2016
*(Date Mailed)*

cc: Human Resources
Manager
CANTEL MEDICAL CORP.
150 Clove Road, 9th Fl.
Little Falls, NJ 07424